**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, DEPARTMENT OF LEGAL AFFAIRS, | COMPLAINT FOR DAMAGES, CIVIL PENALTIES, INJUNCTIVE RELIEF |
| Plaintiff, | DEMAND FOR JURY TRIAL |
| v. | |
| NSK LTD., NSK AMERICAS, INC., NTN CORPORATION, NTN USA CORPORATION, JTEKT CORPORATION, KOYO CORPORATION OF U.S.A., AB SKF, SKF USA INC., SCHAEFFLER AG, and SCHAEFFLER GROUP USA INC., | Case No. _____ |
| Defendants. | |

Plaintiff, the State of Florida, Office of the Attorney General, Department of Legal Affairs ("State of Florida"), files this Complaint against Defendants NSK Ltd., NSK Americas, Inc., NTN Corporation, NTN USA Corporation, JTEKT Corporation, Koyo Corporation of U.S.A., AB SKF, SKF USA Inc., Schaeffler AG, and Schaeffler Group USA Inc. (hereafter "Defendants"), and alleges:

## I.  NATURE OF THE ACTION

1.     The State of Florida brings this action against the Defendants under the Sherman Act, the Clayton Act, the Florida Antitrust Act, and the Florida Deceptive and Unfair Trade Practices Act on behalf of itself and its governmental entities and on behalf of businesses and individual consumers within Florida.  Plaintiff demands a trial by jury of all triable issues as stated herein.

2.     Defendants and their co-conspirators conspired to suppress and eliminate competition with respect to the sale and manufacture of bearings.  These price-fixed parts were

installed in vehicles purchased by Plaintiff, as well as by businesses and individual consumers within Florida (hereafter "bearings vehicles").  In addition, Plaintiff, as well as businesses and individual consumers and government entities within Florida, purchased replacement bearings for their vehicles.

3.     Defendants and their co-conspirators agreed, combined, and conspired to inflate, fix, raise, maintain, or artificially stabilize the prices of bearings.

4.     Due to Defendants' and their co-conspirators unlawful conduct, Florida government entities, Florida businesses, and individual consumers have paid higher-than-competitive prices for bearings and bearings vehicles and have thereby suffered antitrust injury to their business or property.  Florida government entities and Florida businesses and individual consumers were also deprived the benefits of competition in the pricing of bearings and bearings vehicles.

5.     The bearings at issue in this case are those installed in an automotive vehicle used to position, hold and guide moving parts, as well as to reduce friction between moving and fixed parts.  Bearings are located throughout a vehicle.  Bearings include ball bearings, tapered roller bearings, roller bearings, mounted bearings, and parts and components for ball and roller bearings, all used in the vehicles that are the subject of this complaint.

6.     Defendants' conspiracy affected millions of dollars of commerce in Florida and the United States.

7.     The relevant time period for the unlawful conduct complained of herein is January 1, 2000 to the present ("Relevant Period").

8.     The Attorney General of Florida has reviewed this matter and determined that an enforcement action serves the public interest.

## II.     JURISDICTION AND VENUE

9.      This is an action for damages, permanent injunctive relief, civil penalties, and attorneys' fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as Chapters 542 and 501, Florida Statutes.

10.     This Court has original jurisdiction over the federal antitrust claim pursuant to 28 U.S.C. § 1331 and § 1337.  This Court has subject matter jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because these claims are so related to the federal claim that they form part of the same case or controversy that would ordinarily be tried in one judicial proceeding.  The exercise of supplemental jurisdiction avoids unnecessary duplication and multiplicity of actions and is in the interest of judicial economy, convenience, and fairness.

11.     Venue is proper in the United States District Court, Eastern District of Michigan, under 15 U.S.C. § 22 and 28 U.S.C. § 1391.  Each Defendant transacts business, committed an illegal or tortious act, or is found in this district, and a substantial part of the events giving rise to the claims arose in this district.

## III.     PARTIES

### A.     Plaintiff

12.     The State of Florida is authorized to file Count I under 15 U.S.C. §§ 15 and 26 to enjoin Defendants from the violations alleged herein.

13.     The Attorney General of Florida is the chief legal officer of Florida and the enforcement authority of Chapter 542, Florida Statutes, and is authorized to file Count II seeking the full range of relief afforded by Chapter 542, Florida Statutes.

14.     The Department of Legal Affairs of Florida is the enforcing authority for violations of Chapter 501, Florida Statutes, and has the authority to file Count III to enjoin any

person who has violated the Florida Deceptive and Unfair Trade Practices Act and to seek actual damages on behalf of one or more individual consumers, businesses, and governmental entities in Florida, including direct and indirect purchases.

## B.   Defendants

15.   NSK Ltd. is a corporation organized and existing under the laws of Japan with its principal place of business in Tokyo, Japan.  NSK Ltd. has approximately 12% of its sales in the Americas, including the United States.  On information and belief, NSK Ltd., directly and/or through its wholly owned and/or controlled subsidiaries, manufactured, marketed and/or sold bearings that were purchased by Florida governmental entities, Florida businesses, and/or Florida individual consumers during the Relevant Period.

16.   NSK Americas, Inc. ("NSK Americas") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Ann Arbor, Michigan.  NSK Americas is a subsidiary of NSK and is wholly owned or controlled by NSK. NSK Americas has an office in Florida and regularly transacts business in Florida.  On information and belief, Defendant NSK Americas sold bearings that were purchased by Florida governmental entities, Florida businesses, and/or Florida individual consumers during the Relevant Period.  During the Relevant Period, NSK controlled and directed NSK Americas' activities in the United States.

17.   NSK Ltd. and NSK Americas have shared executives.  For example, Bernard Lindsay served concurrently as Chief Operating Officer for NSK Americas and Vice President for NSK Ltd.  He was promoted to Chief Executive Officer, NSK Americas, and to Senior Vice President of NSK Ltd.  Masahide Matsubara, a senior Vice President at NSK Ltd. is the former Chief Executive Officer of NSK Americas.

4

18.     Defendants NSK and NSK Americas shall collectively be referred to herein as "NSK".

19.     NTN Corporation is a corporation organized and existing under the laws of Japan, with its principal place of business in Osaka, Japan.  NTN Corporation has over 25% of its sales from the Americas, including the United States.  On information and belief, NTN Corporation, directly and/or through its wholly owned and/or controlled subsidiaries, manufactured, marketed and/or sold bearings that were purchased by Florida governmental entities, Florida businesses, and/or Florida individual consumers during the Relevant Period.

20.     NTN USA Corporation ("NTN USA") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Mount Prospect, Illinois.  NTN USA is a subsidiary of NTN and is wholly owned or controlled by NTN.  On information and belief, Defendant NTN USA sold bearings that were purchased by Florida governmental entities, Florida businesses, and/or Florida individual consumers during the Relevant Period.  During the Relevant Period, NTN controlled and directed NTN USA's activities in the United States.

21.     NTN Corporation and NTN USA have shared executives.  For instance, Tadatoshi Kato is currently the president of NTN USA but he is also a former Director, Managing Director and Senior Managing Director of NTN Corporation.  The current Chairman of the Board and Representative Director is Yasunobu Suzuki and he is also a former Chairman of NTN USA.

22.     Defendants NTN and NTN USA Corporation shall collectively be referred to herein as "NTN".

23.     JTEKT Corporation is a corporation organized and existing under the laws of Japan with its principal place of business in Osaka, Japan.  JTEKT Corporation has 17 % of its

5

sales from the United States.  On information and belief, JTEKT Corporation, directly and/or through its wholly owned and/or controlled subsidiaries, manufactured, marketed and/or sold bearings that were purchased by Florida governmental entities, Florida businesses, and/or Florida individual consumers during the Relevant Period.

24.     Koyo Corporation of U.S.A. ("Koyo") is a corporation organized and existing under the laws of the State of South Carolina with its principal place of business in Westlake, Ohio.  Koyo is a subsidiary of JTEKT Corporation and is wholly owned or controlled by JTEKT Corporation.  On information and belief, Koyo sold bearings that were purchased by Florida governmental entities, Florida businesses, and/or Florida individual consumers during the Relevant Period.  During the Relevant Period, JTEKT Corporation controlled and directed Koyo's activities in the United States.

25.     JTEKT Corporation and Koyo have shared executives.  For example, Shuji Miyakai was an executive Director and Board Member at JTEKT Corporation as well as Chairman and Board Member to Koyo.  Ken Hopkins is currently the President and COO at Koyo and the COO at JTEKT Corporation.

26.     Defendants JTEKT and Koyo shall collectively be referred to herein as "JTEKT".

27.     AB SKF is a corporation organized and existing under the laws of Sweden with its principal place of business in Gothenburg, Sweden.  North America accounts for 22% of AB SKF's global sales.  On information and belief, AB SKF, directly and/or through its wholly owned and/or controlled subsidiaries, manufactured, marketed and/or sold bearings that were purchased by Florida governmental entities, Florida businesses, and/or Florida individual consumers during the Relevant Period.

6

28.     SKF USA Inc. ("SKF USA") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Lansdale, Pennsylvania. SKF USA is a subsidiary of AB SKF and is wholly owned or controlled by AB SKF. On information and belief, SKF USA sold bearings that were purchased by Florida governmental entities, Florida businesses, and/or Florida individual consumers during the Relevant Period. During the Relevant Period, AB SKF controlled and directed SKF USA's activities in the United States.

29.     AB SKF and SKF USA have also shared numerous executives. For instance, Tom Johnstone is the current Chief Executive Officer and President at AB SKF but was the former Chief Executive Officer and President at SKF USA. He is also a member of the AB SKF Group Management. Poul Jeppesen is the Chief Executive Officer and President at SKF USA. He is also a member of AB SKF Group Management.

30.     AB SKF reports its sales by business segment, such as the automotive segment, rather than by subsidiary. The sales of SKF USA are not separately reported in AB SKF's Annual report; rather, automotive original equipment manufacturers ("OEMs") sales are reported as part of the automotive segment. The automotive segment president, Tom Johnstone, is located at SKF in Goteborg.

31.     Defendants SKF and SKF USA shall collectively be referred to herein as "SKF".

32.     Schaeffler AG is a corporation organized and existing under the laws of Germany with its principal place of business in Herzogenaurach, Germany. Schaeffler AG has 15% of its sales in North America, including the United States. On information and belief, Schaeffler AG, directly and/or through its wholly owned and/or controlled subsidiaries, manufactured, marketed

and/or sold bearings that were purchased by Florida governmental entities, Florida businesses, and/or Florida individual consumers during the Relevant Period.

33.    Schaeffler Group USA Inc. ("Schaeffler Group USA") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Fort Mill, South Carolina.  Schaeffler Group USA is a subsidiary of Schaeffler AG and is wholly owned or controlled by Schaeffler AG.  On information and belief, Schaeffler Group USA sold bearings that were purchased by Florida governmental entities, Florida businesses, and/or Florida individual consumers during the Relevant Period.  During the Relevant Period, Schaeffler AG controlled and directed Schaeffler Group USA's activities in the United States.

34.    Schaeffler AG described Schaeffler USA on its website as one of Schaeffler's "Worldwide Locations."

35.    Schaeffler USA and Schaeffler AG have shared numerous executives.  For example, Klaus Rosenfeld, the Chief Financial Officer and Member of the Executive Manager Board of Schaeffler AG is also the Chief Financial Officer of Schaeffler USA.  Dr. Jürgen M. Geissenger is the CEO of both Schaeffler USA and Schaeffler AG.  Georg F.W. Schaeffler is a Board Member at both Schaeffler AG and Schaeffler USA.

36.    Defendants Schaeffler and Schaeffler USA shall collectively be referred to herein as "Schaeffler".

## IV.    CO-CONSPIRATORS AND AGENTS

37.    Various persons, including Nachi-Fujikoshi Corp., Nachi America Inc. and other persons unknown to the State of Florida at the present time, conspired with the Defendants in the violations of law alleged in this Complaint.  These co-conspirators engaged in conduct and made

8

statements in furtherance of the conspiracy.  The State of Florida reserves the right to name some or all of these persons as Defendants at a later date.

38.     Any reference in this Complaint to any act, deed, or transaction by a corporation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

39.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

40.     Each of the Defendants named herein acted as the agent or joint venture of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## V.     BACKGROUND

### A.     Bearings

41.     Bearings are a key component of a vehicle's suspension.  The bearings are metal balls or rollers that permit the wheels of a vehicle to rotate with reduced friction.  For example, bearings are set between a tire and the axle as well as inside the wheels of the vehicle in a special slot called the "cage."  They rotate around the cage while the vehicle is operating and thus evenly distribute the load of the vehicle.  Additionally, bearings improve vehicle performance and allow for smooth driving.  They are designed to last 150,000 miles but can break down, requiring replacement.

42.     Defendants manufactured and supplied bearings to OEMs for installation in automobiles as part of the vehicle manufacturing process.  They may also be sold to replace worn out, defective or damaged bearings.  These bearings were either (a) manufactured in the

United States for sale in the United States, including Florida, (b) manufactured abroad and then sold in the United States for assembly in vehicles manufactured and sold in the United States, including Florida, (c) or manufactured abroad and installed in automobiles that were manufactured outside the United States for export and sale in the United States, including Florida.

43.     The OEMs, which include large automotive manufacturers such as Honda, Toyota, Volvo, and General Motors, purchase bearings directly from Defendants by issuing Requests for Quotation ("RFQ").

44.     RFQs invite the suppliers, including Defendants, to bid on providing the bearings to the OEM.  The RFQs are issued and supplied on an individual model-by-model basis.  The RFQs seek a supplier to provide the bearings for the duration that a vehicle platform is in production--generally 4-6 years.  Upon receipt of the RFQ, suppliers then submit quotations to the OEM who will award the business.

45.     Defendants have sold bearings to multiple automobile manufacturers, including, for example, Honda, Toyota, Volvo, and General Motors.

46.     SKF has sold to multiple OEMs, including, for example, Ford, Honda, Toyota, Nissan, General Motors and Volvo.

47.     NSK has sold to multiple OEMs, including, for example, Toyota and Nissan.

48.     NTN has sold to multiple OEMs, including, for example, Ford, Nissan, and Honda.

49.     JTEKT has sold to multiple OEMs, including, for example, Nissan, Toyota, Ford, BMW and General Motors.

50.     Schaeffler has sold to multiple OEMs, including, for example, Nissan, Toyota, GM and Ford.

51.     These and other OEMs installed the bearings in automobiles that were sold to businesses, individual consumers, and governmental entities in the State of Florida.  Therefore, Plaintiff and Florida businesses and individual consumers, and Florida governmental entities paid more for the automobiles containing the price-fixed bearings than they would have paid absent the conspiracy.  Furthermore, an owner of a vehicle in Florida may also indirectly purchase replacement bearings from Defendants when repairing a damaged vehicle or when the vehicle's bearings are defective.

### B.     The Defendants Raised Prices of Bearings Despite Decreasing Automotive Sales during the Relevant Period

52.     The prices for bearings increased significantly during the Relevant Period.  From 2000 through 2011 the price of bearings increased by approximately 45%.  This increase occurred despite a period of falling demand as during the Relevant Period the auto industry faced a period of declining sales.  In 2000, there were over 17 million vehicles sold in the United States; by the end of the Relevant Period, that number had fallen to approximately 12 million–a decrease of 27%.

53.     Despite falling demand, the price of bearings continued to increase.  Prices increased even in the years where auto sales fell considerably.  From 2007 to 2009, for example, vehicle sales shrank from 16 million to 10 million vehicles per year a decrease in demand of 35%.  Nevertheless, the Defendants raised prices by 13% during that time.

54.     In a competitive market, and according to standard theories of supply and demand, falling demand would lead companies to decrease prices in order to attract new customers.  Companies would also decrease prices to ensure their market share.  In an

11

uncompetitive market where competitors have conspired to fix prices, however, competitors do not lower prices even when faced with decreasing demand in order to maximize revenue. This is because the competitors understand they will not see a reduction in sales due to a risk of being undercut by a competitor's lower prices.

> **C.    The Characteristics of the Bearings Market Support the Existence of a Conspiracy**

55.    The characteristics and structure of the bearings market in the United States are conducive to price-fixing.

56.    The bearings market has very large barriers of entry that prevent or hinder new firms from entering or competing in the market. A new market participant would need to spend significant sums of money to build production facilities as well as to research and develop the necessary intellectual property to produce bearings. A new market participant would also need to find employees skilled in the production and development of bearings as well as obtain sufficient business to make the new enterprise profitable.

57.    The market for bearings is highly inelastic because there are no close substitutes for these products. In addition, customers must purchase bearings as an essential part of a vehicle, even if the prices are kept at a supra-competitive level.

58.    The global market size for bearings in 2013 was estimated to be over $14 billion, with the United States' market accounting for roughly $3 billion of the global total. The bearings market is highly concentrated and is dominated and controlled by a small number of manufacturers, including Defendants.

59.    In the global market, SKF has approximately 19% market share, Schaeffler has 18%, NSK 13%, JTEKT 9%, and NTN 8%. Upon information and belief, the top three suppliers

of bearings control nearly 75 % percent of the U.S. market.  A highly concentrated market is more susceptible to collusion and other anticompetitive practices.

### D.   Government Investigations

60.   Competition authorities in the United States, Japan, Europe, Canada, Australia, and Singapore have launched antitrust investigations into possible violations of the antitrust laws within the bearings market and in some cases have obtained guilty pleas and/or imposed fines.

### 1.  United States

61.   The United States Department of Justice ("DOJ") is conducting an investigation of automotive suppliers, including those in the bearings industry.  The DOJ investigation has yielded guilty pleas by 26 companies.  These companies have paid fines currently totaling $2.3 billion.  Additionally, 32 executives and employees from these companies have pled guilty or been charged stemming from this investigation.  Those that have pled guilty have been sentenced to approximately 29 years in jail combined.  DOJ has stated that the investigation is ongoing.

62.   DOJ has obtained several guilty pleas from Defendants.

63.   On or about September 19, 2013, Defendant JTEKT entered a Plea Agreement with the DOJ that was filed in the U.S. District Court for the Southern District of Ohio, agreeing to plead guilty to two violations of the Sherman Antitrust Act, 15 U.S.C. § 1, in connection with its sales of bearings.

64.   JTEKT admitted that, as to count I, from as early as the year 2000 through at least July 2011, it "participated in a conspiracy with other bearing manufacturers, the primary purpose of which was to suppress and eliminate competition in the automotive parts industry by agreeing to allocate markets, rig bids for, and to fix, stabilize, and maintain the prices of bearings sold to Japanese automobile and component manufacturers in the United States and elsewhere."

65.     JTEKT further admitted, "[i]n furtherance of the conspiracy, the defendant [JTEKT], through its managers and employees, engaged in discussions and attended meetings with co-conspirators employed by other bearings manufacturers.  During these discussions and meetings, agreements were reached to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of bearings sold to Toyota and certain other Japanese automobile manufacturers in the United States and elsewhere.  The conspiratorial conversations and meetings described above took place in the United States and elsewhere."

66.     Identical allegations were made in count II involving the OEM Nissan.  The relevant period for count II was 2005 through at least October 2011.

67.     According to the Information, JTEKT and its co-conspirators carried out the antitrust conspiracy involving bearings by "employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations."

68.     As part of the plea, JTEKT agreed to pay a fine of $103.27 million.  JTEKT also agreed to cooperate with the DOJ in the continued prosecution of other companies for violation of the antitrust laws involving the manufacture and sale of bearings.

69.     On or about September 19, 2013, Defendant NSK entered a Plea Agreement with the DOJ that was filed in the U.S. District Court for the Southern District of Ohio, agreeing to plead guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, in connection with its manufacture and sales of bearings.  NSK admitted that from as early as the year 2000 through at least July 2011, it "participated in a conspiracy with other bearing manufacturers, the primary purpose of which was to suppress and eliminate competition in the automotive parts industry by agreeing to allocate markets, rig bids for, and to fix, stabilize, and maintain the prices of bearings sold to Japanese automobile and component manufacturers in the United States and elsewhere."

14

70.     NSK further admitted, "In furtherance of the conspiracy, the defendant [NSK], through its managers and employees, engaged in discussions and attended meetings with co-conspirators employed by other bearings manufacturers.  During these discussions and meetings, agreements were reached to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of bearings sold to Japanese automobile and component manufacturers, including coordinating price adjustments requested by these Japanese automobile and component manufacturers, in the United States and elsewhere.  The conspiratorial conversations and meetings described above took place in the United States and elsewhere."

71.     As part of the plea, NSK agreed to pay a fine of $68.2 million.  NSK also agreed to cooperate with the DOJ in the continued prosecution of other companies for violation of the antitrust laws involving the manufacture and sale of bearings.

72.     According to the Information filed by the DOJ, NSK and its co-conspirators carried out the antitrust conspiracy involving bearings by "employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations."

73.     NTN stated in its 2012 Final Report that its "United States consolidated subsidiary received a subpoena from the United States Department of Justice requesting the submission of information related to transactions in bearings."

74.     Schaeffler reported that it was a subject of the DOJ's antitrust investigation of the bearings industry in its 2011 Annual Report.

75.     SKF has confirmed that it and other companies in the bearings industry are part of the antitrust investigations by the DOJ.

76.     One of the members of the conspiracy is the leniency applicant but the identity has not been publicly disclosed.

15

**2.  Japan**

77.     The Japanese Fair Trade Commission ("JFTC") launched its investigation in July 2011 after Defendant JTEKT alerted the JFTC of the cartel's existence and sought leniency. Japan's leniency program grants full immunity from prosecution to the company if it admits its participation in the cartel and provides the JFTC with the relevant information detailing the anticompetitive violation.  JTEKT was not prosecuted criminally by the JFTC because of its admission and cooperation.

78.     The JFTC conducted on-site inspections on July 26 and 27, 2011 of Defendants NSK, NTN, JTEKT, and co-conspirators based on evidence that the companies violated the Antimonopoly Act of Japan ("AMA") in relation to their sales of bearings.

79.     On June 14, 2012, the JFTC filed a criminal accusation against NSK, NTN and their co-conspirators as well as seven employees of the companies.  According to the accusation, the companies had several meetings with competitors to discuss the price-fixing of bearings. The companies agreed to raise the price of steel (a key component of bearings) by 8% for general bearings and for 10% for larger bearings.

80.     Similarly, the Tokyo District Court found Defendant NSK and three former executives guilty of participating in a price-fixing cartel for bearings and industrial machinery bearings.  Keisuke Takagawa and Katsumi Kuwabara, former senior vice presidents, and Yoshi Nishiyama, a former head of the industrial machinery business division, were sentenced to serve prison terms.  The Tokyo District Court also issued a criminal fine against NSK for ¥380,000,000 (approximately $4 million).

81.     On or about March 29, 2013, the JFTC issued cease and desist orders against Defendants NTN, NSK, and co-conspirators for their conduct in fixing the prices of bearings in

16

violation of Article 3 of the AMA.  The JFTC issued fines against these companies for their participation in the conspiracy.

82.     The JFTC fined Defendant NTN in the amount of ¥7,231,070,000 (approximately $76.7 million) for NTN's role in the illegal scheme to fix the prices of bearings.

83.     The JFTC fined Defendant NSK in the amount of ¥5,625,410,000 (approximately $59.7 million) for NSK's role in the illegal scheme to fix the prices of bearings.

84.     The JFTC found that Defendant JTEKT violated Japan's Antimonopoly Act by participating in a conspiracy to fix or raise the prices of bearings but, on information and belief, did not issue a cease and desist order because JTEKT provided information to the JFTC that led to the investigation after it applied to the leniency program in June 2011.

### 3.  Europe

85.     The European Commission ("EC") received complaints from OEMs in 2010 and 2011 and executed surprise raids at the European offices of certain Defendants and their co-conspirators as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts, including bearings.

86.     In its 2011 Annual Report, SKF admitted that with respect to its sales of bearings it is "part of an investigation by the European Commission regarding a possible violation of EU antitrust rules."

87.     SKF has stated publicly it will be subject to a substantial fine from Europe's antitrust watchdog some time in 2014.  SKF indicated it would take a $455 million charge for the anticipated EC fine as a result of its conduct in the sales of bearings.

88.     Similarly, Schaeffler has acknowledged the EC's antitrust investigation of its sales of bearings.  In a December, 2013 press release, Schaeffler stated that it is cooperating with

17

the EC investigation and expects a fine to be imposed by the EC in 2014.  As a result, Schaeffler set aside €380 million in the fourth quarter of 2013 for the anticipated fine.

89.     On March 19, 2014, the European Commission found that the Defendants and their co-conspirators operated a cartel in the market for automotive bearings.  The EC found that the "companies colluded to secretly coordinate their pricing strategy."

90.     The total fines imposed by the EC comprised approximately $1.3 billion.  Each Defendant admitted to their participation in the conspiracy and paid fines as follows: Schaeffler, $515 million; SKF, $438 million; NTN, $280 million; and NSK, $86 million.  JTEKT was not fined because it was the leniency applicant and disclosed the existence of the conspiracy to the EC.  If JTEKT were not the leniency applicant it would have been subject to a fine of $117 million.

91.     In setting the fines, the EC took into account the sales of the products, the nature of the violation and the conspiracy's scope.  The Defendants received a 10% reduction for their admission of their participation in the cartel and their liability.

92.     EC Vice President Joaquin Almunia called the fines a "milestone in the Commission's ongoing efforts to bust cartels in the markets for car parts."  Continuing, "I hope the fines imposed will deter companies from engaging in such illegal behavior and help restore competition."  Mr. Almunia stated, "cartels for car parts might impair the competitiveness of the automotive sector and artificially raise the price paid by European consumers who buy cars."  He also said that the EC found that the Defendants and their co-conspirators entered into an agreement not to undercut each other's prices to keep existing supply stable.

93.    The EC found that the Defendants and their co-conspirators set prices at multilateral meetings, also called "steel" or "club" meetings.  Additional meetings occurred between two or three Defendants to supplement the larger meetings.

94.    The EC press release stated, "the companies involved in this secret cartel coordinated the passing-on of steel price increases to their automotive customers."  These companies "colluded on [RFQs] and for Annual Price reductions from customers and exchanged commercially sensitive information."

95.    SKF President and CEO Tom Johnstone said that the conspiracy was "unacceptable" and a "clear violation of our values and the SKF code of conduct."

### 4.  Canada

96.    Canada's Competition Bureau announced on July 12, 2013, that Defendant JTEKT pled guilty to two counts of bid rigging under Canada's Competition Act and received a fine of $5 million from the Superior Court of Quebec in Gatineau for JTEKT's role in "an international bid-rigging cartel" involving the sale of bearings to Toyota.

97.    According to a July 12, 2013 press release by Canada's Competition Bureau (hereinafter, the "Press Release"), JTEKT participated in the leniency program administered by Canada's Competition Bureau and provided substantial assistance to the Bureau.

98.    According to the Press Release, JTEKT's plea agreement relates to bearings supplied to Toyota Motor Manufacturing Canada Inc. between 2007 and 2013.

99.    The Press Release further states, "The evidence shows that JTEKT secretly conspired with another Japanese bearings manufacturer to submit bids or tenders in response to requests for quotations to supply Toyota."

19

### 5.  Australia

100.    On or about October 18, 2013, JTEKT announced that its Australian subsidiary, Koyo Australia, was paying approximately $1.9 million to settle antitrust charges related to its sales of bearings.  A spokesman for JTEKT said that JTEKT's internal investigation revealed that Koyo Australia may have fixed the prices of bearings.  JTEKT applied for leniency with Australian authorities in exchange for cooperation.

### 6.  Singapore

101.    On or about December 16, 2013, the Competition Commission of Singapore ("CCS") issued a Proposed Infringement Decision ("PID") against JTEKT, NSK, NTN, and their co-conspirators and their Singapore subsidiaries related to anti-competitive agreements in the sales of bearings in violation of section 34 of the Competition Act.

102.    According to an article by Asia One, the CCS found that the companies "met regularly at meetings both in Japan and Singapore where they exchanged information, [and] discussed and agreed on sales prices for ball bearings sold to their respective customers in Singapore."

### E.    Opportunities to Conspire

103.    During the Relevant Period, Defendants and their co-conspirators had opportunities to meet and perform acts in furtherance of their conspiracy while attending trade association meetings and other industry events, including meetings of the World Bearing Association ("WBA").

104.    The WBA meetings provided Defendants NSK, NTN, Schaeffler, Koyo, SKF and their co-conspirators additional opportunities to engage in improper discussions and perform acts in furtherance of their price-fixing conspiracy.  Defendants and their co-conspirators participated

20

in meetings, conversations, and communications to discuss pricing for bearings sold in the United States.

106. Defendants and their co-conspirators participated in meetings, conversations and communications to discuss the prices for bearings sold in the United States.

106. Additionally, Defendants and their co-conspirators would produce and sell bearings to each other.  As part of these sales, employees from Defendants would necessarily have regular contact with each other.  These contacts would afford ample opportunities to conspire.

## VI.    TRADE AND COMMERCE

107. Throughout the Relevant Period, Defendants and their co-conspirators engaged in the business of designing, manufacturing, selling and/or distributing bearings in a continuous and uninterrupted flow of interstate and foreign trade and commerce to businesses and individual consumers located in Florida and the United States.  Defendants and their co-conspirators collectively controlled the vast majority of the market for bearings, both globally and in the United States.

108. Defendants' and their co-conspirators' unlawful activities took place within the flow of and substantially affected interstate trade and commerce, as well as trade and commerce within the State of Florida.  Defendants' and their co-conspirators' conduct had a direct, substantial, and reasonably foreseeable effect on domestic interstate commerce within the United States, including Florida.  As a direct and proximate result of the acts as alleged herein, the general economy of the United States, including Florida, sustained injury.  Defendants knew and expected that bearings would be installed in automobiles that would be sold in the United States and in the State of Florida.  Additionally, NSK, NTN, JTEKT, and SKF sold directly to Florida

21

businesses.  These effects proximately caused the domestic injuries alleged in this Complaint because Florida governmental purchasers, businesses, individual consumers, and other end-payors paid more for bearings and bearings vehicles than they would have absent the conspiracy.

109.    Plaintiff, as well as businesses and individual consumers within Florida, directly and indirectly purchased bearings from NSK through their purchase of bearings vehicles and replacement bearings.

110.    Plaintiff, as well as businesses and individual consumers within Florida, directly and indirectly purchased bearings from NTN through their purchase of bearings vehicles and replacement bearings.

111.    Plaintiff, as well as businesses and individual consumers within Florida, directly and indirectly purchased bearings from JTEKT through their purchase of bearings vehicles and replacement bearings.

112.    Plaintiff, as well as businesses and individual consumers within Florida, directly and indirectly purchased bearings from SKF through their purchase of bearings vehicles and replacement bearings.

113.    Plaintiff, as well as businesses and individual consumers within Florida, indirectly purchased bearings from Schaeffler through their purchase of bearings vehicles and replacement bearings.

114.    Defendants' and their co-conspirators' conspiracy specifically targeted the United States market and had a direct, substantial, and reasonably foreseeable effect on United States and Florida commerce.  There is a domestic injury that is concrete, quantifiable, and directly traceable back to the Defendants' and their co-conspirators' anticompetitive conduct.

## VII.    THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS

115.    Defendants' and their co-conspirators' conspiracy to raise, fix, maintain, and/or stabilize the price of bearings at artificial levels resulted in harm to the State of Florida and its businesses, individual consumers, and governmental entities because the conspiracy resulted in higher prices for bearings and bearings vehicles than they would have paid in the absence of Defendants' and their co-conspirators' conspiracy.  The entire overcharge at issue was passed on to the State of Florida and its businesses, individual consumers, and governmental entities.

## VIII.   FRAUDULENT CONCEALMENT/EQUITABLE ESTOPPEL

116.    Fraudulent concealment, a species of equitable estoppel in Florida, precludes Defendants from asserting a statute of limitations defense in this matter.

117.    To the extent that Defendants claim that the State of Florida's filing is late, Defendants bear responsibility for the late filing.

118.    Defendants and their co-conspirators committed fraudulent acts and actively concealed those acts, including concealing the existence of the conspiracy alleged in this Complaint.

119.    The State of Florida exercised due diligence to learn of its legal rights and, despite such diligence, failed to uncover the possible existence of the violations alleged in this Complaint.

120.    The State of Florida did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until 2012, when reports of the Japanese investigations into anticompetitive conduct concerning bearings were

23

first made available to the public. Defendants are directly responsible for any delay in the filing of this Complaint

121.    Further, Defendants' role in the auto price fixing investigation was kept secret and not publicly known until news of issuance of cease and desist orders by the JFTC against Defendants was announced on or about June 14, 2012. That the Defendants' conspiracy extended to the United States was not known until the announcement of DOJ plea deals on September 26, 2013 at the earliest.

122.    Defendants and their co-conspirators fraudulently concealed the existence of the violations alleged in this Complaint.

123.    Defendants engaged in a successful, illegal price-fixing conspiracy that by its nature was inherently self-concealing. Defendants utilized code names and agreed to meet in secret at locations where the conspiracy was less likely to be detected. Bearings are not exempt from antitrust regulation, and thus, prior to the official launch of criminal investigations, the State of Florida reasonably considered the bearings market to be a well- regulated and competitive industry.

124.    Moreover, Defendants represented publicly, both to customers and otherwise, that their pricing and bidding activities were competitive. In so representing, Defendants affirmatively concealed the fact of their anticompetitive scheme.

125.    The affirmative acts of Defendants and their co-conspirators alleged in this Complaint were wrongfully concealed and were carried out in a manner that precluded detection. Furthermore, Defendants and their co-conspirators knew their activities were illegal.

126.    In the context of the circumstances surrounding Defendants' and their co-conspirators' pricing practices, Defendants' and their co-conspirators' acts of concealment were

more than sufficient to preclude suspicion by a reasonable person that Defendants' and their co-conspirators' pricing was not the result of competition.

127.    The State of Florida could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to fraudulently conceal and to avoid detection of their contract, combination or conspiracy.

128.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, the State of Florida had no knowledge of the alleged conspiracy or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed until reports of the investigations were first publicly disseminated.

129.    Upon having reasonable suspicion of the existence of Defendants' and their co-conspirators' conspiracy, the State of Florida exercised due diligence by promptly investigating, to the extent permitted by law, the facts giving rise to the claims asserted herein.

130.    None of the facts or information available to the State of Florida prior to 2012, if investigated with reasonable diligence, could or would have led to the discovery of Defendants' conspiracy alleged herein prior to 2012.

### IX.    VIOLATIONS ALLEGED

### COUNT I

**(Violation of Section One of the Sherman Act)**

131.    The State of Florida incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

132.    Defendants' acts violate Section 1 of the Sherman Act, 15 U.S.C. § 1, and the State of Florida is entitled to injunctive relief resulting from the Defendants' conduct as stated above.

133.    Defendants knowingly – that is, voluntarily and intentionally – entered into a continuing agreement, understanding, and conspiracy to raise, fix, maintain, and/or stabilize the prices charged for bearings during the Relevant Period, continuing through the filing of this Complaint.

134.    Florida government entities, Florida businesses, and individual consumers directly and indirectly purchased within Florida bearings and bearings vehicles.

135.    Florida government entities and Florida businesses and individual consumers have been injured and will continue to be injured in their business by paying more for bearings and bearings vehicles purchased directly and indirectly from the Defendants and their co-conspirators than they would have paid in the absence of the conspiracy.

136.    As a direct result and proximate result of the Defendants' conduct, Florida government entities and Florida businesses and individual consumers have been harmed and will continue to be harmed by paying supra-competitive prices that they would not have had to pay in the in the absence of the Defendants' conduct as alleged herein.

137.    Unless permanently restrained and enjoined, Defendants will continue to engage in conduct that restricts competition for bearings and bearings vehicles.

## COUNT II

### (Violation of the Florida Antitrust Act)

138.    The State of Florida incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

26

139.    This is an action that alleges a violation of the Florida Antitrust Act, Section 542.18, Florida Statutes, and the State of Florida is entitled to equitable relief resulting from the Defendants' conduct as stated above.

140.    The State of Florida also seeks the maximum civil penalties under Section 542.21, Florida Statutes, for each contract, combination, or conspiracy in restraint of trade or commerce.

141.    Defendants knowingly – that is, voluntarily and intentionally – entered into a continuing agreement, understanding, and conspiracy to raise, fix, maintain, and/or stabilize the prices charged for bearings during the Relevant Period, continuing through the filing of this Complaint.

142.    Florida government entities, Florida businesses, and individual consumers directly and indirectly purchased within Florida bearings and bearings vehicles.

143.    Florida government entities and Florida businesses and individual consumers have been injured and will continue to be injured in their business by paying more for bearings and automobiles containing bearings purchased indirectly from the Defendants and their co-conspirators than they would have paid in the absence of the conspiracy.

144.    As a direct and proximate result of the Defendants' conduct, Florida government entities and Florida businesses and individual consumers have been harmed and will continue to be harmed by paying supra-competitive prices for bearings that they would not had to pay in the in the absence of the Defendants' conduct as alleged herein.

145.    The sale of bearings and bearings vehicles in the State of Florida involves trade or commerce within the meaning of the Florida Antitrust Act.

## COUNT III

### (Violation of the Florida Deceptive and Unfair Trade Practices Act)

146.    The State of Florida incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

147.    This is an action that alleges a violation of the Florida Deceptive and Unfair Trade Practices Act, Section 501.204, Florida Statutes.  The State of Florida seeks damages, pursuant to Section 501.207(1)(c), Florida Statutes, for all purchases of bearings and bearings vehicles by governmental entities, businesses, and individual consumers in the State of Florida.  The State of Florida also seeks the maximum civil penalties under Sections 501.2075 and 501.2077, Florida Statutes, for each violation of the Florida Deceptive and Unfair Trade Practices Act.

148.    The indirect sale of bearings and bearings vehicles in the State of Florida to Plaintiff and individual consumers involves trade or commerce within the meaning of the Florida Deceptive and Unfair Trade Practices Act.

149.    Defendants indirectly sold to Plaintiff, as well as businesses and individual consumers within Florida, bearings and bearings vehicles.

150.    Defendants' actions offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to Florida governmental entities, to businesses in the State of Florida, and to consumers in the State of Florida.  Thus, Defendants' unfair methods of competition and unconscionable acts and practices in the conduct of trade and commerce violate Section 501.204, Florida Statutes.

## X.   PRAYER FOR RELIEF

151.    Accordingly, the State of Florida requests that this Court:

a.      Adjudge and decree that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. §1;

b.      Adjudge and decree that Defendants violated Section 542.18, Florida Statutes;

c.      Adjudge and decree that Defendants violated Section 501.204, Florida Statutes;

d.      Enjoin and restrain, pursuant to federal and state law, Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anticompetitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anticompetitive actions set forth above;

e.      Award to the State of Florida any other equitable relief as the Court finds appropriate to redress Defendants' violations of federal or state law to restore competition;

f.      Award to the State of Florida damages to the maximum amount permitted under Section 501, Florida Statutes;

g.      Award to the State of Florida any other statutory damages, restitution or equitable disgorgement for the benefit of the state and its consumers, as appropriate;

h.      Award to the State of Florida the maximum civil penalties under Section 542.21, Florida Statutes, for each contract, combination, or conspiracy in restraint of trade or commerce;

i.      Award to the State of Florida the maximum civil penalties under Sections 501.2075 and 501.2077, Florida Statutes, for each violation of the Florida Deceptive and Unfair Trade Practices Act;

j.      Award to the State of Florida its costs, including reasonable attorneys' fees and, as may be appropriate under the law, expert witness fees and investigation costs; and

k.      Order any other relief that this Court deems proper.

## XI.   DEMAND FOR JURY TRIAL

152.   The State of Florida demands a trial by jury of all issues so triable in this case.

Respectfully submitted this 27th day of May, 2014.

The State of Florida

PAMELA JO BONDI
Attorney General
STATE OF FLORIDA

_____s/ Timothy M. Fraser_____
PATRICIA A. CONNERS (Florida Bar No. 361275)
Associate Deputy Attorney General
Trish.Conners@myfloridalegal.com
R. SCOTT PALMER (Florida Bar No. 220353)
Special Counsel for Antitrust Enforcement
Scott.Palmer@myfloridalegal.com
GREGORY S. SLEMP (Florida State Bar No. 478865)
Greg.Slemp@myfloridalegal.com
TIMOTHY FRASER (Florida Bar No. 957321)
Timothy.Fraser@myfloridalegal.com
Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399-1050
Tel:      (850) 414-3300
Fax:     (850) 488-9134

Attorneys for Plaintiff State of Florida